UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO: 22-10884 |
| EDWARD KENNETH NOVAK, | § § | CHAPTER 7 |
| DEBTOR. | § § § | SECTION A |
| W.L.P. CAPITAL, INC., | § § § | |
| PLAINTIFF, | § § § | |
| V. | § § | ADV. NO. 23-1005 |
| EDWARD KENNETH NOVAK, | § § § | |
| DEFENDANT. | § § | |

## MEMORANDUM OPINION AND ORDER

On August 3, 2022, Edward Novak ("Novak") filed a voluntary chapter 7 bankruptcy petition in this Court. [No. 22-10884, ECF Doc. 1]. W.L.P. Capital, Inc. (the "Plaintiff") filed Proof of Claim No. 2 against Novak for $1,387,048.20 based on a final judgment obtained from a Utah state court. The Utah state court issued a default judgment against Novak holding him liable as a personal guarantor of debts owed under a factoring agreement between the Plaintiff and Novak's former employer, Patriot Group Services, Inc. ("Patriot Group"). On March 24, 2023, Plaintiff commenced the above-captioned adversary proceeding, alleging that the factoring agreement itself was procured by actual fraud and thus seeking a determination that their claim against Novak is nondischargeable under 11 U.S.C. § 523(a)(2)(A). [ECF Doc. 1].

On November 9, 2023, this Court held a one-day trial in the adversary proceeding. The Court heard testimony from Robert Damare and Novak, and found them both to be earnest and credible witnesses. The Court admitted into evidence Plaintiff's Exhibits 1–5, 7, 10 & 12 as well

as redacted versions of Plaintiff's Exhibits 17–19 & 21 and Defendant's Exhibits 1, 3 & 4. [ECF Doc. 28]. The Court took judicial notice of Plaintiff's Exhibit 11. *See id.* Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court now makes the following findings of fact and conclusions of law and concludes that the debt claimed by Plaintiff against Novak in Proof of Claim No. 2 is dischargeable.[1]

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matter presently before the Court constitutes a core proceeding that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

Patriot Group is a Louisiana-based construction company founded in 2014 by Dustin Porte ("Porte"). *See* Hr'g Rec'g 11:08 (Nov. 9, 2023); Plaintiff Ex. 1. Porte serves as Patriot Group's President and Chief Executive Officer, and in that role, his main tasks involve finding new clients, approving payments, and sourcing financing. *See* Hr'g Rec'g 11:15–:16. From Patriot Group's inception in 2014 until December 31, 2016, Novak served as Patriot Group's Chief Operating Officer. *See* Hr'g Rec'g 11:08–:10. Novak was responsible for project management, that is, estimating costs and soliciting bids, facilitating completion of projects, and handling payments to contractors and subcontractors upon approval. *See* Hr'g Rec'g 11:07–:31. Novak was and remains a 10% shareholder of Patriot Group. *See* Hr'g Rec'g 11:55, 12:49. The record does not reflect who owns the other 90% of Patriot Group.

---

[1] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

2

A third individual, Paul Lea ("Lea"), is loosely affiliated with Patriot Group as well. Lea serves as Porte's personal attorney, but he has assisted with various legal and financial tasks related to Patriot Group. *See* Hr'g Rec'g 11:34. The record does not reflect whether Lea had an ownership interest in Patriot Group or whether Lea ever had an employment contract at Patriot Group or served as an officer of the company.

Transfac Capital, Inc. ("Transfac") is a Nevada corporation with its main office located in Salt Lake City, Utah. *See* Plaintiff Ex. 1. Transfac is in the factoring business and is a wholly owned subsidiary of the Plaintiff. *See* Hr'g Rec'g 11:54.

**The Purchase and Sale Agreement**

On March 23, 2016, Transfac and Patriot Group entered into a factoring agreement entitled "Purchase and Sale Agreement" (the "PSA"). *See* Plaintiff Ex. 1. Novak signed the PSA on behalf of Patriot Group and John D. Thompson, Chief Financial Officer of Transfac, signed on behalf of Transfac. *See* Plaintiff Ex. 1; Hr'g Rec'g 11:15. As with standard factoring agreements, the PSA granted Transfac a standing option to purchase certain of Patriot Group's accounts receivables at a discount, thereby providing Patriot Group with immediate cash. Transfac could then collect the full amount of the accounts receivable directly from Patriot Group's customers. *See* Plaintiff Ex. 1. The PSA set the discounted rate for Transfac's purchase of accounts receivable and prohibited Patriot Group from collecting accounts receivable that had been purchased by Transfac. *See* Plaintiff Ex. 1, ¶¶ 3 & 13. In the event of a customer's direct payment of an account receivable, the PSA required Patriot Group to hold those funds in trust and immediately notify and deliver the payment to Transfac. *See* Plaintiff Ex. 1, ¶ 13(f). Failure to do so constituted a default under the PSA. *See* Plaintiff Ex. 1, ¶ 25(a)–(b).

To secure its obligations under the PSA, Patriot Group granted Transfac a continuing security interest in all of Patriot Group's accounts receivable along with most of its other assets (the "Collateral"). *See* Plaintiff Ex. 1, ¶¶ 1 & 15. With Porte, Novak also personally guaranteed the debts owed under the PSA. *See* Plaintiff Ex. 4. Novak never formally terminated or obtained a release from that guaranty even after he stopped working for Patriot Group. *See* Hr'g Rec'g 11:51–:52, 12:49–:52.

### Novak's Departure from Patriot Group

In December 2016, Novak stopped working at Patriot Group, and in January 2017, he began full-time employment with a company called General Work Products ("GWP"). *See* Hr'g Rec'g 11:09–:10, 12:38; Defendant Ex. 1. Despite his informal resignation from Patriot Group, Novak remained somewhat active in the business affairs of Patriot Group through the first quarter of 2017. *See* Hr'g Rec'g 11:09–:14. Novak amicably departed from Patriot Group and he remained on good terms with Porte, so he continued to assist with Patriot Group's operations remotely, even though he was employed full-time elsewhere. *See* Hr'g Rec'g 11:12, 12:35. Patriot Group did not compensate Novak for any of the work he performed for Patriot Group in 2017 and his tax returns reflect that fact. *See* Hr'g Rec'g 12:40–:44; Defendant Ex. 3.

By March 2017, Novak was traveling extensively for his new employer, GWP. *See* Defendant Ex. 3; *see* Hr'g Rec'g 11:18–:19; 12:40–:44. Novak no longer had capacity to assist Patriot Group remotely, so on March 31, 2017, he submitted a formal letter of resignation to Porte. *See* Plaintiff Ex. 7; Hr'g Rec'g 11:10–:12. After his formal resignation, however, Novak was not immediately removed as a signatory on Patriot Group's bank accounts at Chase Bank, but was removed within weeks. *See* Hr'g Rec'g 11:10–:45. At his request, Novak's name was finally

removed from Patriot Group's corporate information held with the Louisiana Secretary of State in October 2017. *See* Hr'g Rec'g 11:41–:51; Plaintiff Ex. 5.

### The Bridge Loan and Distribution Agreement

At some point prior to 2016, Robert Damare ("Damare") made a personal loan to Porte to provide liquidity to Patriot Group (the "Bridge Loan"). *See* Hr'g Rec'g 10:48–11:25. In 2016, Damare provided general contracting services on behalf of Patriot Government Services, LLC ("Patriot Government"), which completed projects in association with Patriot Group.[2] *See id*. Damare communicated directly with Porte during the course of their business relationship and was only peripherally familiar with Novak. *See id*.

In early 2017, Damare executed an agreement with Patriot Group to repay the Bridge Loan (the "Distribution Agreement"). *See* Plaintiff Ex. 3; Hr'g Rec'g 10:52. Porte and Lea executed the Distribution Agreement on behalf of Patriot Group. *See* Plaintiff Ex. 3. Damare was unaware of the PSA or that Patriot Group had any pre-existing relationship with Transfac. *See* Hr'g Rec'g 10:53. By the time the Distribution Agreement was executed, Novak was already working full-time at GWP. *See* Hr'g Rec'g 11:09–:10, 12:38. Although he continued to perform some services remotely for Patriot Group until March 2017, he was uninvolved with the negotiation and execution of the Distribution Agreement. Novak did not sign the Distribution Agreement, and he was unaware of its existence until this adversary proceeding was initiated. Plaintiff Ex. 3; *see* Hr'g Rec'g 12:37–:38.

---

[2] Despite the similarity in names, the record does not reflect that Patriot Group and Patriot Government are in any way corporately affiliated.

**The Addendum to the PSA**

Meanwhile, in or about March 2017, Patriot Group and Transfac purportedly entered into an agreement intended to be the "First Addendum to Purchase and Sale Agreement" (the "<u>Addendum</u>"). *See* Plaintiff Ex. 2. The Addendum provides that the PSA and the Addendum "shall be read and construed together as one agreement." Plaintiff Ex. 2, ¶ 5. Under the terms of the Addendum, the Plaintiff advanced an additional $640,123.36 to Patriot Group (the "<u>Overadvance</u>") over and above the advances for which Patriot Group was eligible under the original PSA, which Patriot Group would repay over thirty monthly installments with interest. *See* Plaintiff Ex. 2, ¶ 1(a)–(c). The Plaintiff maintained its security interests in and rights related to the Collateral. *See* Plaintiff Ex. 2, ¶ 2.

The signature line for Transfac on the copy of the Addendum entered into evidence is blank, as is the exact date of the Addendum's execution. *See* Plaintiff Ex. 2. The signature line for Patriot Group contains an electronic signature reading "Edward K. Novak" and an identical electronic signature is included in a section reaffirming Novak's personal guaranty from the 2016 PSA of "all obligations of [Patriot Group] to Transfac." *See id*. Porte's signature is on the Addendum, but only to reaffirm the personal guaranty from the 2016 PSA of "all obligations of [Patriot Group] to Transfac." *Id*. Porte did not testify and nothing in the record serves to authenticate that signature.

Based on Novak's testimony and the circumstances and timing of his departure from Patriot Group, *see* Hr'g Rec'g 11:09–12:38, the Court finds that Novak did not authorize the use of his electronic signature on the Addendum to bind Patriot Group or reaffirm his own personal guaranty of debts owed to Transfac by Patriot Group.

6

**Utah Default Judgment Against Novak**

At some point after June 2017, Plaintiff learned about the existence of the Distribution Agreement and informed Damare and Patriot Government of the PSA, Addendum, and its security interests in the Collateral. *See* Hr'g Rec'g 10:49. At that time, Plaintiff alleged that Patriot Group had defaulted on its payment obligations under the Addendum. *See* Plaintiff Ex. 10, ¶ 37; *see* Hr'g Rec'g 10:50.

On February 7, 2019, Plaintiff filed a lawsuit against Patriot Group, Novak, and Porte in a Utah state court, alleging breach of the PSA and Addendum and seeking to enforce the personal guaranties of Novak and Porte. *See* Plaintiff Ex. 10. Plaintiff did not allege fraud in the execution of the PSA or the Addendum. *See id.* Patriot Group, Novak, and Porte failed to defend that lawsuit in Utah. *See* Hr'g Rec'g 01:15–:16. The Utah state court entered separate default judgments, one against Patriot Group and Porte and one against Novak. *See* Plaintiff Exs. 11 & 12.

**Novak's Bankruptcy and this Adversary Proceeding**

On August 3, 2022, Novak filed a voluntary chapter 7 petition in this Court. [No. 22-10884, ECF Doc. 1]. On January 9, 2023, Plaintiff filed Proof of Claim No. 2 against Novak in the amount of $1,387,048.20 based on the default judgment it obtained against Novak in Utah state court. At this time, Plaintiff asserts through this adversary proceeding that the Overadvance was obtained by actual fraud. Specifically, Plaintiff asserts that the Distribution Agreement between Patriot Group and Patriot Government constitutes a fraudulent conveyance scheme that diverted funds that belonged to the Plaintiff under the PSA and Addendum and thus the debt owed to Plaintiff by Novak is nondischargeable under 11 U.S.C. § 523(a)(2)(A). [ECF Doc. 1].

## CONCLUSIONS OF LAW

A debtor's discharge under the Bankruptcy Code is subject to nineteen enumerated exceptions in 11 U.S.C. § 523(a). Section 523(a) of the Bankruptcy Code provides in relevant part:

> (a) A discharge under [the Bankruptcy Code] does not discharge an individual debtor from any debt—
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A).

A plaintiff seeking to hold a debt nondischargeable must show its entitlement to relief by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991); *Tower Credit, Inc. v. Gauthier*, 349 Fed. App'x. 943, 945 (5th Cir. 2009). "A fact is proven by preponderance of the evidence if the finder of fact . . . finds it more likely than not, based on the evidence, that the fact is true." *In re Ryan*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). But the Bankruptcy Code only affords relief to the "honest but unfortunate debtor"; an individual may not obtain a discharge of debts incurred through his own wrongful conduct. *See Grogan*, 498 U.S. at 286–87; *In re Koukhtiev*, 576 B.R. 107, 122 (Bankr. S.D. Tex. 2017).

At trial, Plaintiff relied solely on the "actual fraud" exception under § 523(a)(2)(A). To prevail, Plaintiff must prove (1) that Novak is personally liable for the debt under applicable state

law and (2) that Novak's personal obligation to the Plaintiff under state law falls within the universe of debts that are nondischargeable under § 523(a)(2)(A). *See In re Ritz*, 567 B.R. 715, 737–39 (Bankr. S.D. Tex. 2017). There is no dispute regarding Novak's personal liability for the debt given the default judgment issued against Novak by the Utah state court. *See* Hr'g Rec'g 12:00–:01. The sole issue is whether the debt was obtained by actual fraud such that it is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Actual fraud is fraud committed with wrongful intent. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Basing its analysis on long-standing precedent, the *Husky* Court explained:

> This Court has historically construed the terms in § 523(a)(2)(A) to contain the "elements that the common law has defined them to include." "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* at 360 (internal citations omitted). Wrongful intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence. *See In re Ozcelebi*, 640 B.R. 884, 897 (Bankr. S.D. Tex. 2022). "When examining a debtor's intent under section 523(a)(2)(A), the Court is required to consider whether the circumstances in the aggregate present a picture of deceptive conduct on the part of the debtor, which betrays an intent on the part of the debtor to deceive his creditors." *Lawrence v. Frost Bank (In re Lawrence)*, No. 21-10103, 2022 WL 118966 at *3 (5th Cir. Jan. 12, 2022) (citations omitted).

Plaintiff alleges that the Addendum (and the Overadvance) was "procured through false pretenses, false representations, and/or actual fraud" because Patriot Group directed its customers to pay amounts owed under the Distribution Agreement. [ECF Doc. 1, ¶ 25]. According to

9

Plaintiff, "Patriot [Group] and its management intended to carry out this scheme when the [Addendum] was executed, as indicated by the Distribution Agreement, which appears to predate the execution of the [Addendum]." *Id*. The Court finds, however, that Plaintiff has failed to meet its burden to show that the Addendum was executed with wrongful intent.

Robert Damare provided evidence as to Patriot Group's intent behind entering into the Distribution Agreement with Patriot Government. Damare testified that the Distribution Agreement was designed to memorialize a repayment plan for the Bridge Loan he had provided to Porte. *See* Hr'g Rec'g 10:52–:53. Damare was unaware of any relationship between Patriot Group and the Plaintiff, *see id.*, and his testimony provides evidence only of the business-related purpose possessed by the parties in entering into the Distribution Agreement, not the intent on the part of Patriot Group toward the Plaintiff in entering into the Addendum. Novak himself testified, but he was uninvolved with the negotiation or execution of the Distribution Agreement and this Court has found that he likewise was uninvolved with any negotiation or execution of the Addendum. The record is silent as to Patriot Group's motives in entering into the Addendum and, given the dearth of direct or circumstantial evidence as to intent, this Court can only conclude that no wrongful intent can be inferred from the totality of the circumstances here.[3]

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the relief sought by Plaintiff in the Complaint is **DENIED**, and the debt claimed by Plaintiff in Proof of Claim No. 2 in the amount of $1,387,048.20 is **DISCHARGABLE**.

---

[3] The Plaintiff subpoenaed Porte to testify, but Porte moved to quash the subpoena. For the reasons stated on the record on November 9, 2023, the Court granted Porte's motion to quash. [ECF Doc. 28]. No one was called to testify on behalf of the Plaintiff.

10

**IT IS FURTHER ORDERED** that the Ex Parte *Motion for Leave To File Supplemental Memorandum*, [ECF Doc. 32], is **DENIED**.

A separate judgment on the Complaint consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, October 21, 2024.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE